Give me a report. The appellate court of Illinois has been adjourned. Good morning. Please be seated. First case up this morning is 412-0916 Banister v. McPartridge. For the appellant is Peggy Ryan. For the appellate is Randy Pasquato. You are? You are? Are you sure? Okay. Ms. Ryan, you may proceed. Good morning. May it please the court? Counsel.  My name is Peggy Ryan, and I represent the petitioner appellant across appellate, Leah Guffey Banister, who I will refer to as Leah. Leah, in December of 2011, was granted leave to remove Drexel, who was then nine years old, from Illinois. They moved to Fort Campbell, Kentucky, where Leah's husband, Tom, was a sergeant in the Army. He commenced school there in the fall of 2011. Then, in April of 2012, Leah filed a second removal petition, as her husband, Tom, had been transferred to Maine as head of an ROTC program there. The trial court denied the subsequent removal petition, but stayed its order. As matters now stand, Leah and Drexel have been living in Maine since summer of 2012, and Drexel is in fourth grade in Brewer, Maine, which is just across the river from Bangor, Maine. Leah's appeal is brought on two grounds. First, a statutory ground, and then second, with respect to the merits, that it was against the manifest weight of the evidence, to deny the subsequent removal petition. First, with respect to the statutory basis, and this is based on a case by the name of Taveras, that comes out of the Fifth District Appellate Court. It's a 2006 case, and it's pretty on point. It involved a family that first removal was allowed, pursuant to an agreed order, to the state of Alaska. Later, the mom was planning on moving to the state of Texas, and a subsequent removal petition was filed. And in that Fifth District case, the trial court said that removal issues, it said that they're governed by strictly statute, by the Illinois Marriage and Dissolution of Marriage Act and the Parentage Act. And the statutory provision deals with removing children from Illinois. That's what the statute says. Section 604A of the Illinois Marriage and Dissolution of Marriage Act, specifically speaks to removing children from Illinois. It doesn't address removing children from one foreign state to another foreign state. So what would be your position then, counsel, with regard to a situation where the trial court has granted a request to change, let the custodian, primary custodian move out of state with the child, that the court is bereft of any authority to ever review this matter again, even though it's still the court that has otherwise been fully active with regard to this dissolution of marriage and all subsequent and collateral matters? Well, I don't think it would be fair to say that the court can never review it again. And I don't really think that this is a jurisdictional issue. I think it's a removal issue. So if the parent remaining who continued to live in Illinois filed a petition, for instance, to change custody, I think the court would still have jurisdiction to hear that. But in terms of removal, I think that the statute does say, from Illinois, and once removal from Illinois has been allowed, then that parent is free to remove to a different state. So if, in this very case, if a request is granted to move to Indiana, or it could be from Quincy, Illinois to Hannibal, Missouri, just a matter of a few miles away, that's carte blanche to then go to San Francisco or Portland or Boston, and the court is without authority to even enter into the picture? I don't think there's any other statutory provision in place. No, I didn't. I phrased my question carefully. I didn't ask you about any other statutory provision. Right. My question was, is the court without any authority of any kind? I think the court is without authority in terms of the removal issue. I think it still has authority with respect to custody. So the parent who got permission to move to Hannibal, Missouri from Quincy can now take San Francisco, and the court is without any authority to grant any relief to the non-custodial parent to say, wait a minute, that's just too far? I think it has the authority with respect to modifying visitation. Is the answer to my question yes? The answer to your question, is it without authority, yes. I think that it is. On removal. That's what the Dissolution of Marriage Act, when the legislature passed it, intended? Yes. Does that make good sense? When all else fails, let's ask that question. Does it make good sense to you that the court, and you're talking to a former trial judge. I know I am. I've granted these requests. Yes. And to think that, well, if I grant this request, four months from now, mom might be taken off of San Francisco, I can do nothing about it? Is that a good policy? I think that the presumption that you can do nothing about it means that you can't modify visitation, you can't modify custody. And I think that that is a substantial change of circumstances, potentially. So as the trial court, I could modify visitation or custody, but not where the child will live? Well, I think it's a creature of statute. And I think that the statute says... If there is any basis to interpret a statute, any uncertainty, ought not statutes be interpreted not to lead to absurd results? I don't think it does lead to absurd results. So as the trial judge, I can address visitation and custody, but not where the child will be living? Well, I think that once removal is granted, it's granted. So the answer to my question is yes. Yes, it is. In follow-up with Justice Steigman's commentary here, if instead the trial court had allowed the... Well, let's just say that your scenario is correct, and there could be a move from Kentucky to Maine, but the trial court still maintains the ability to control visitation, still has jurisdiction over the visitation issues. If the pick-up and drop-off for a visitation had been in Paducah, Kentucky, if the child is living in Maine, can the trial court still require pick-up and drop-off in Paducah, Kentucky? And isn't that an absurd result along the lines of what Justice Steigman is referring to? Yeah, I think that would be an absurd result. And I think that in terms of the visitation, that illustrates how the court does still have jurisdiction to address the visitation issue. In terms of policy and absurd results, and especially when you're looking at military families like this, this whole suggestion that every time there is a move, one has to return to court is certainly burdensome on the custodial parent. And, you know, Taveras and then Justice Myerscough in her dissent in the Lang case, which is the Fourth District case that is involved here, I mean, addressed this issue too, of a degree of deference, perhaps, that is due the custodial parent to have the ability to make decisions about what is best for a child and for herself in terms of these removal issues. And Taveras has been on the books since 2006. The law hasn't changed in terms of how it's written in terms of from Illinois. And certainly the legislature, I think, would have had opportunity to change that or modify that if, in fact, that had been their intention. What about your posture before this court in that you're the party who brought the petition? I did. Which was denied. Yes. Isn't there some sort of estoppel that applies here? Should you be permitted to seek permission to transfer to another state, have it denied, and then say, oh, by the way, Judge, you know that petition I filed? You don't have authority to grant it. Well, my particular... You don't have authority to hear it. Yes. My particular situation here is that I had the Taveras case that I was looking at, which was a newer case. Then there's also the Lange case, which is a Fourth District case. And was I comfortable going before Judge Sanchez saying, just leave, just go, just go from the state of Kentucky and go to the state of Maine without bringing this to the attention of the court? I didn't think that was transparent. It was not something I was comfortable doing at a very gut level. You know, in looking back, in retrospect, might some kind of a deck action, a declaratory judgment action or something have been in order. But no, I don't think I'm stopped any more than the mom in the Taveras case was stopped when the court directed her to file a removal petition. And then the court said, no, the court shouldn't have directed her to do that. She wasn't stopped. I don't think I'm stopped. I think it's a tricky issue. Is Lange no longer good law? Is it your view that Lange is no longer good law? I think, well, no, I think that there's a, I think the Fourth District and the Fifth District are odds, and that happens sometimes. What about Taveras citing Lange within its very body and saying, well, we're not really disagreeing with it? I think that was odd because they did disagree with it. I think it was very much in disagreement. And I think that it was in agreement with Justice Myerscough. I mean, I think that Justice Myerscough and the Taveras case are pretty much in line in terms of how they viewed it. But I don't, I think they are at odds, the two different cases. So then to the merits, to the merits of this removal case. Justice, or Judge Sanchez wrote a very extensive, detailed brief with respect to the reasons why removal was allowed in the first place. Those reasons are still in full force and effect today. And those had to do with her being a very good mother, her husband being in the military, this being a solid marriage. This is now a four-year marriage that the two of them have, that my client was there to meet this child when he got off the bus, there to take care of him, there to fix him dinner, there to do homework, there to address his special education needs, his medical needs, all of which the record is complete with my client having been the person who did all of those things. This is, by Judge Sanchez's account, an extremely good mother who has, since the birth of this child, made very, very good decisions for this child. The reasons that are set forth for the removal to Kentucky are reasons that remain for the removal to Maine. And in staying, it's order. Judge Sanchez allowed this little boy to stay in Maine, continue with his fourth grade year in school in Maine, and basically his rock has always been his mom in terms of the woman who's in charge and who has taken care of and made sure that he was nurtured and loved and cared for. The situation that is created by the subsequent removal petition being denied is to put Leah Guffey Bannister right back in the situation that she was when this gentleman, her husband Tom, was deployed to Afghanistan, which is basically you have two separate homes. He was living at Fort Campbell before he was deployed. The financial ramifications that come with that, the life ramifications that come with that, and that's basically what is at issue here, is having two separate households, two separate incomes, and all the rest of those things. And I think when looking at the cases in the Fourth District and other cases throughout Illinois, that this is the type of case that warrants the granting of removal, taking aside all the statutory issues and so forth, that this is a case where removal should have been granted. What happens if this court affirms what kind of household arrangements can be made? What would that mean? She has to return to Illinois or Kentucky? I think that has a lot to do with where she'd find a job. I think that legally she could, if that were the case, return to the state of Kentucky if she could find a better job there. I think that she could return perhaps somewhere to this area. This whole concept that has been advanced by Mr. Partridge that this child would be put back in the school that he was in in kindergarten and first grade and so on and so forth is conclusory. I don't know that that would happen, and certainly our client would not be living with her husband and would have the financial problems associated with that. By all accounts, this is a very happy child. He likes the step-siblings. I think the examples that are being set for him in the household of Tom, who heads off to work every day and does important work for this country, with respect to watching what Leah does every day. He has a step-sibling that's now away at college, which is a terrific example to be setting. He has another high school age step-sibling. By all accounts, he's crazy about them, they're crazy about him, and it's a very positive household situation. So I think we are looking at very difficult type things for Leah and for Drexel in the event that the court affirmed the decision. Is Randy still living in Cantrell, Illinois? I believe that Mr. Partridge is still living in Cantrell, Illinois. Yes. Where is Cantrell? Cantrell is not too far. I'm not going to be able to tell you exactly where it is, but it's close to Sherman, and I think it's also in that Sherman-Williamsville school district kind of area. But Cantrell may be in a different school district. I can't recall, but I think it's all within 15 minutes of each other. So with respect to the whole Eckert standard that the court, and I'm sure the court is very familiar with the whole Eckert standard, it's been cited time and time again, and one of the factors there is the likelihood of advancing the general quality of life for the mom and the child. And I think in this particular case the general quality of life is being advanced. In regards to Eckert, is it your position that the trial court gave undue weight to the Eckert factor relating to being able to establish a realistic visitation schedule? It is my position. And I think that with respect to visitation, there's case law that says visitation doesn't have to be perfect, and I don't think visitation would be perfect. But I think visitation is very, very achievable. The visitation schedule that was in place for Kentucky has remained in place and has been followed. There's been no content petitions filed with respect to that at all, showing that visitation is very achievable. The airport in Bangor, Maine is very close to where my client lives. Her family is here in terms of Christmas and Thanksgiving and those sorts of things. Her family is all here anyway. And we're part of the continental United States. I think that visitation, the proposal set forth for my client with extended visitation in the summer, with extended visitation over the Christmas holidays, spring break, and Thanksgiving, many of them which she would absolutely handle all the transportation because she would be coming here anyway, make for very meaningful, achievable visitation. Not perfect, but certainly meaningful and doable, as has been evidenced since the move took place in terms of visitation that has occurred. And I do think that that was given certainly more weight than should have been in light of reading the 2011 decision, the December 2011 decision, which is page after page of what a good mother my client has been. Not just a good mother in terms of her taking care of this little boy, but in the fact that she advanced visitation for Mr. Partridge under very tough circumstances. Because Mr. Partridge, when this little boy was about three years old, was in a very, very serious accident. He pled guilty to DUI. He had many, many broken bones. Was in a coma for a number of days. And then thereafter, there was another incident involving drinking. He ended up pleading guilty to reckless driving. All in all, caused his license to not have a license for, I believe, three years. She went and picked him up and took him to the child sporting events and to school events. She facilitated the visitation. And I think the record in this case of her having facilitated even the visitation from Kentucky, she did it. She is the one who arranged it, facilitated it, sent emails, and here's how we should do it. She's the one who promoted phone calls and so forth. And the record shows Mr. Partridge, though he loves his child very much, I'm quite sure, he was not the one who was spearheading that. He was not spearheading visitation. He never once went to Kentucky. He one time met my client halfway. So in addition to being a really good mom, she also has worked diligently over the years to keep this relationship between Randy and his son very positive. I'm sorry, sir. How old is your client? Thirty-five. How old is Thomas Bannister? I believe he has turned 57 years of age. And he has two children, an adult daughter and a son from a prior marriage? He does. And with respect to Drexel's relationship, I think he had little to no relationship. There's a daughter that was spoken of. I think he met like three times of Mr. Partridge's daughter. One time he met her at a bar, I think at Weebles, and another time at Buffalo Wild Wings or something. Very little relationship. Now Tom, my client's husband, he has two children, one of them 14 years of age, and one of them who is in college right now. That's who I was asking. Oh, I'm sorry. And they have a very good, strong relationship, yes. How old is Tom? Tom is 42. I'm very close on that. Okay. Yeah, he's been in the military 25 years, and I think he went in at 19. Okay. Your time is up, and you'll have an opportunity to address this again. Thank you, sir. Mr. Passlaw. Good afternoon. May it please the Court. Counsel. Seated with me at counsel's table today is Randy Partridge, my client in this case. And I'm going to just take the issues as they've been addressed in the briefs, one, two, and so on. With regard to the first issue that has been addressed, the Court's continuing jurisdiction for a second or subsequent removal petition, I think as the Court kind of indicated in the questioning, this Court would have to reverse this Court's decision in Lange if it decides to follow Tavares. And I think that Lange is still good law and sets out and is based on the fact that the Court has authority to enforce and modify a removal order. And that's right in the statute. The statute with regard to the Parentage Act was amended in 2003. Specifically, Section 16 was put in there to allow modification of an order for support, custody, visitation, or removal. So the legislature, the General Assembly, has gone through and set out very specifically that the Court can modify a removal order. And that's all that the Court was being asked to do. If we affirm the trial court in this case, what do you envision would be the next series of events with regard to Leah Dexter and her home situation? It's my belief that Leah will return to Illinois. That's not just my belief. It's what she testified to in the trial court. She said, we're coming back here to Illinois. Her new husband, Tom Bannister, said, I have to get out of the military when I reach 29 years. That's not discretionary. That's mandatory for a person of my position. And that's a very key fact and a way to distinguish this case from pretty much any other that's out there in terms of being reported cases. This is a temporary move. This child is coming back to Illinois. The parties involved are from Illinois. How temporary? 2015. June of 2015 was the testimony. Tom Bannister would be out by then. It's been my experience that when you have people who have been in a long time, they have a crude leave, and it's probably even sooner than that. So for the next two years, where would Leah be living and what would she be doing? Well, I think that Leah is going to have to find a job. I think she's going to return to Illinois and move back in with her mother where she lived, the testimony was she lived. Where is that? That's in the Williamsville-Sherman area, which is the school that Drexel went to for five years prior to this. He started in pre-kindergarten, went all the way up through second grade, and then at the end of second grade is when he moved to Kentucky. So that's the same community. That's a small community. It's the same community that he was involved in sports in, all the soccer, the Cub Scouts, football, all those things. Those are the same kids that he's going to be around. That stability is important for Drexel, and I think it's important for a couple of reasons. First, the evidence was that Drexel is a child with learning disabilities. He has a very difficult time in school, and it's important when the second removal petition is being filed, the position that Leah took was the court can't deny this. They've already granted it once. Not only should I be allowed to take the child to Maine, I should be able to take the child anywhere else that my new husband gets reassigned to. I should never have to come back to the trial court. I don't think that's good law. I think that the better course is for the court to say just reading from Illinois two words as being a restriction of the court's authority is just not a good public policy and does not comport with the plain language of Section 16 of the Parentage Act, which says that the court has continuing jurisdiction to modify. Also in the Parenting Act, explicit language put in in 2003, since this court's decision in Lange, you have the continuing ability to enforce specific statutory authority. The Eckert opinion, it's the Supreme Court's, made it very clear that the Parentage Act and the Dissolution Act, when they were amended in 2003 by the General Assembly, were designed to be read synonymously, that they're supposed to be similar, so that there's not much distinction between a divorce case, post-judgment enforcement of a divorce case, and post-judgment enforcement of a parentage case. And that's what we're asking this court to do. We're asking the court very simply to uphold Lange and to do so for the same exact rationale set forth in Lange. Does the record show any problem with Leah's current custody and with how Dexter is living in the home with Tom and the others? One of the major difficulties in prosecuting this kind of case in moving is, my client is here in Illinois. He doesn't have access to a lot of information. There wasn't a whole lot of testimony other than what Leah would report or said, or any ability for my client really to cross-examine that to a large extent as to what's going on in Maine. I will say the one major difference between Kentucky and Maine is, in Kentucky, there were step-siblings that aren't there in Maine anymore. There were what? There were step-siblings. Of Tom's kids, he actually has three children. There's an older son who doesn't reside with them. There's an older daughter who's stayed back in Kentucky, didn't move. And then there's a 14-year-old girl, I believe, named Haley, or maybe it's Taylor, but the record's clear, who continues to reside with Tom and Leah in Maine. But the record's also clear that Tom doesn't even have custody of that other child. Pursuant to some kind of agreement that he has with that child's mother, who has custody, he has the child in Maine, but presumably that child could be taken back at any time, which I think, again, there's some instability inherent in this move to Maine that it is temporary. The move is going to be back here to Illinois very shortly. How old is Dexter? Drexel, at this point, is 10 years of age, I believe. His birthday is here in the spring, I believe. Mr. Passwater, in regards to the Eckert factors again here, along the lines of what you were talking about, if the court were to affirm the trial court's handling of this and if your anticipated sequence were to pan out where Leah would have to move back and she would have to get a job, then that would take her from being a stay-at-home mom for Drexel and putting her in the workforce. That's perhaps a negative for Drexel. Do you think the trial court took adequate stock of that? I think the trial court clearly put a lot of emphasis on the fact that Leah was going to be a stay-at-home mom and, in my opinion, in fact, probably put a little bit too much emphasis on that factor. Drexel is a school-aged child who is throughout the day in school. To say that Drexel gets benefit, yes, he does get some indirect benefit, but I would love to be a stay-at-home dad. I don't get to do that, just choose. That's a choice that Leah has made. Yes, it does benefit this child, but in the context of this decision, prior to this, Leah worked. Leah had a great job here in Springfield. She made $41,000 working at the city of Springfield. She has a high school education. That job had benefits and a pension. Fantastic job that she gave up in choosing to follow her husband. It wasn't a brand-new husband, by the way. It was a husband that she had married two years prior. She had chosen to live apart from Tom for two years. He was in Afghanistan, wasn't he? He was for a portion of that, but not all of it. The record is that of the two years, at least a year of that, he was in Fort Campbell. The overarching issue on the record and these other factors in a removal petition is what's in the best interest of the child. How is it in the best interest of the child to deny Leah's petition? I think that the court, rather than go through, it did apply each of the factors set forth in the case law, and it found that of those, that the realistic visitation schedule was not feasible in this case. I think that the manifest way of the evidence is consistent with finding that. Well, visitation is more difficult, certainly, for your client and for the relationship of the child with your client. What other factor would be in the child's best interest or better interest to have this petition denied? Well, first of all, I think it provides some stability for Drexel. Again, we have a very temporary move that's going to be... Over approximately two and a half years in a child who's ten years old, it doesn't strike me as particularly temporary, counsel. Well, for nine years of his life, he had a very strong relationship with his father. Other than this temporary notion, what speaks of how it's better for Drexel to have this petition denied? Very specifically, my client put on extensive evidence as to the things he was involved with his son in doing. There's 20-some pages of things at my client's house where he had day-to-day interaction with his son, where he built a sandbox with his child, where he did swings and did all those kind of physical activities that very simply are the bond that he has with his child. And so with this child in Maine, that strong relationship that Randy has with his son Drexel is going to be gone. It's not going to be the same relationship. And I think that was part of... Isn't that always the case when there's a removal petition to go more than a few hundred miles out of state? I don't know that that's always the case. I think that there could be facts before the court where parties are able to have a relationship through phone contacts, through other kinds of activities. Is there any reason why phone contacts or Skype wouldn't work here? Well, first of all, there's a statutory provision that says that the court in a visitation case can't consider Skype as an alternative. But let me just... You just mentioned it. Well, I did, and here's why. I think when you have to look at the people involved, and that's why you have these cases. They are very fact-dependent. For whatever reason, Randy's contacts and his relationship with his son is a physical relationship where they do things together physically. It's not a, hey, we're going to call up and talk about your day. He doesn't have that kind of relationship with his son. There might be a different fact pattern where you have a parent and a child where they do have a back-and-forth on a phone or have some other ability to have a long-distance relationship. Here, there's some specific facts which basically say that that's really not something that works in this case. Specifically to that, my client was involved in a serious accident. He does have some very serious medical conditions. He can't be in a car for a long period of time. He can't sit for a long duration in a plane, for instance. So the evidence, again, it's very fact-specific. When you start looking at the ability to transport and have a realistic and reasonable visitation schedule, which is what I think the case law says, that in this particular fact pattern is just not something that's... You're a cross-appellant appealing the trial court's denial of your petition to find Lee in contempt? Yes. And that issue, I know it is in the last part of the briefs, but it is actually a very serious issue and one of the reasons my client brought this... Was it a petition to show cause? It was. Based upon her enrolling Drexel in Kentucky schools? That is the petition. The heart of the appeal that my client has filed is very simply in context... Did you identify the petition as a petition for civil or criminal contempt? It's not identified as civil or criminal, but it's... Does it have to be, counsel? I believe that it probably does. Probably does? It does, Your Honor. Okay. When it was originally filed, I was not the counsel of record who filed that, and I don't know why it wasn't done properly, but I should have seen that and fixed it. But we were going on a civil... Did you argue it? Were you the counsel who argued it? I was the counsel who argued it. Did you amend the petition at some point before doing so? I did not amend the petition. Well, tell us, are you seeking to punish Leah for her misbehavior or are you seeking to have her do something in the future to undo her contemptuous behavior? We are seeking something that she be allowed to have the keys to the courtroom, that it be civil contempt. Okay. Well, what is it that you want her to return or undo? First of all, I think that had I been able to argue this issue, I was not allowed to argue the court rule on the contempt, sui sponte, without Leah for argument. I would have made clear some of these issues and the record would be better. But secondly... Well, it might have been because the petition was deficient, counsel. I don't know what the basis was, but, yeah, it could have been that. But for whatever reason, the judge said that he would not hear any argument on the contempt issue. But we would have asked that, and I think it's clear in terms of what the quest for relief was, for some sort of make-up visitation and for a more specific visitation schedule going forward. And that's what was asked for. So that would have purged, that would be the opportunity to purge yourself of contempt? Is that what you're arguing to us? That is the argument, yes. This could have been remedied by some visitation being made up. There are two separate contempt petitions filed. One had to do with the violation of the oral admonishment by Judge Sanchez that Leah was not to take any permanent steps to remove the child to Kentucky from Illinois. Do you think that was an order? I do, and I think that an oral admonishment... I wasn't there, so I don't know, but the judge made it very clear in his statements that he very clearly stated you're not to take permanent steps. In context, I don't know how someone who has a removal petition on file takes a child and then moves them to Kentucky knowing that there's an order that says, don't take permanent steps. To me, there's not a whole lot I can say to argue that other than it can't be very much more clear, in my opinion, when you enroll a child in school that you're trying to advance your removal petition significantly, put yourself in a better position. The fundamental problem that I have with that, and what's in the briefs, is that in context, the petitioner, the person trying to remove the child, should have the burden of proof. That's what the Supreme Court says, that's what the statute provides, that the person asking for removal should have that burden of proof. And when you allow that person to go ahead and enroll the child in school, essentially they're basically getting out of that burden of proof. Now the present custodial situation is Kentucky schools. There can be a pretty fine line drawn in terms of, that was not proper, you can't just enroll the child in school when there's a pending petition on file for injunctive relief to keep the status quo. That's the fundamental problem that I have. The second rule to show cause had to do with ongoing visitation interference. Now, counsel has made the argument that her client had facilitated visitation throughout this. I don't think that's the case. I think the evidence was fairly clear that there were problems with visitation from June 2012 onwards, and that got even worse once that first petition was granted. When the court entered its December order, there was visitation between December and the hearing in July of 2012, and that visitation was poor at best. It was based on an exhibit that was attached to the December order. There wasn't anything in writing in terms of what specific days or what my client's rights were in regards to visitation, and I think that the trial court erred in terms of doing that. That's why we asked for a specific visitation schedule in the August order, was that there were problems, that there was gamesmanship that was going on in terms of not providing information to my client, not allowing visitation, not scheduling visitation, not contacting him until right before visitation was to take place to say, hey, it's going to be moved, or something's going on. And so for those reasons, I ask that the judge's rulings as to the contempt be reversed, and that the court remand for appropriate sanction with direction if that's what the court wants to do. There is one other issue that was in the cross-appeal that has to do with 304B6 in the court's application of that Illinois Supreme Court rule to provide that the removal is a custody judgment and that my client could never attack the very first removal petition. In this case, there was ongoing proceedings after the 2011 order. And those... I see that I'm out of time. You're not? Another minute or so. My client basically, it's in the briefs, you guys can read it, but very simply, 304B6 applies to custody judgments. A removal order is a visitation order, and I've cited the case of four or five different cases. This case in the Chattel, this court is the most recent case in the Chattel, said that 610B does not apply to, or 610 does not apply to a removal order. And basically what I think that is, if you tie those together, 304B6 should not be applied to a removal order. The court should have gone back and when it had the second removal petition in front of it, it should have simply reopened the evidence as to the first one and vacated that. And that goes to the court's question a few minutes ago in terms of, if we reverse this, what do we do? Does she just go back to Kentucky? And my position would be, no, the trial court should have been reversed as to the very first one, or it should have reopened the evidence on that first removal order. And had it done so, then the issue is, what happens in Illinois? With that, I'll... Okay. Thank you, counsel. Ms. Ryan. First, with respect to the tenure of Tom Bannister in the military, in addition to him believing in his military service, that is his job. I mean, he makes $60,000 a year doing it, he gets $1,400 a month for his housing allowance. That is his job. And he testified to, in addition to believing in the mission of the Army, that going out and terminating his job when he's got a family to support, Drexel included, because his health insurance and everything else is through Tom Bannister, that that is something he doesn't want to do because he wants to be able to support his family. So that's a significant factor there. With respect to the visitation issues that counsel spoke about, there simply isn't evidence that visitation did not occur. Visitation happened regularly and continuously based on a visitation schedule that my client had proposed because Mr. Bannister had not proposed a visitation schedule. And there are things in the record like my client, at the end of April, sending an email saying, how about this for your four weeks of summer vacation? And Mr. Bannister never having responded. And he acknowledged finally, yes, I did get that email, but no, I didn't acknowledge it. You mean Mr. Partridge? Mr. Partridge, yes, that he didn't respond to it at all. With respect to telephone, there's a lot of evidence about this little boy calling his dad on Father's Day and his father not having his phone, regarding calling his dad on birthdays repeatedly and his dad not returning the phone calls. The little boy's testimony in the in-camera interview was basically, my dad doesn't like to talk on the phone. So he is correct that there isn't phone contact, but that doesn't mean that there shouldn't be phone contact or that there couldn't be phone contact. It's just not something that Mr. Bannister likes to do. In terms of getting back to what Mr. Partridge likes to do, sorry about that. It's just not something in terms of his communication style that is his kind of thing. With respect to the contempt issues, there was a second petition that was filed with respect to visitation violation. The testimony that was presented, and there was testimony presented on that, was that the only visitation problems at all were my client arriving a bit late on Friday because of the child's end of his school day. And that there was accommodations made for that and with dad having extra time to make up for that. But there was no testimony of there being any kind of a violation of visitation. And I think that the court rightfully didn't even issue a rule with respect to that second issue in the case. My client fell in love with a guy who was in the military. They built a very nice life. In terms of stability, my client has been the one. There's a discussion about special education and so forth. She wrestled that to the ground in Kentucky. She was in the process of wrestling it to the ground in the state of Maine. That is always what she's done. The testimony was, for instance, on military or on medical issues, that dad had taken this child to one physical in his life. Mom had done everything medical. He had been to one parent-teacher conference. Mom had done all of the school types of things. So in terms of stability, that whole core of mom being in charge and mom taking care of business, very much that stability continues. With respect to the older daughter of Tom Bannister, she continues in college, which many, many families have kids who are in college. That doesn't show instability. That actually shows stability and is basically setting a very good example for Drexel. There is nothing indicative of this being anything other than a strong family. As Justice Appleton mentioned, there was a period of time when Tom Bannister was in Afghanistan, about a year. My client opted not to move to Fort Campbell, to maintain things in Illinois until that Afghanistan tour was over, to try to keep things a bit more stable, and then advance the move. There is reference to, what is it, the 14-year-old girl? Yes. That's Taylor. Mr. Bannister. Yes. Does he have custody? He is under a power of attorney, a military kind of power of attorney that he has this child, and this child has been with him for years, a long period of time. Was there any evidence in this record suggesting that this is not going to continue in the future? Absolutely not. And the evidence was of a very fine relationship that she had with Leah, and that she was very happy in the household, and there was no suggestion of that. And there was paperwork. It had to do with the military power of attorney paperwork, I believe is what it was. Thank you, Counsel. Thank you, sir. We'll take this matter under advisement and be in recess for a few moments.